IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)

| | | |
|---|---|---|
| NICHOLAS M. SCHMITZ<br>13501 Query Mill Road<br>Potomac, MD 20878 | * * * | |
| Plaintiff, | * | Civil Action No.: _____ |
| v. | * | |
| | * | JURY TRIAL DEMANDED |
| VERDAD ASSET MANAGEMENT, LLC<br>695 Atlantic Avenue<br>4th Floor<br>Boston, MA 02111, and | * * | |
| DANIEL RASMUSSEN<br>695 Atlantic Avenue<br>4th Floor<br>Boston, MA 02111, | * * * | |
| Defendants. | | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**COMPLAINT FOR MONEY DAMAGES
AND INJUNCTIVE RELIEF**

Plaintiff, Nicholas M. Schmitz, by and through undersigned counsel, files his Complaint against Defendants, Verdad Asset Management, LLC, and Daniel Rasmussen. In support thereof, Plaintiff states as follows:

**PARTIES**

1. Plaintiff, Nicholas M. Schmitz ("Mr. Schmitz"), is an adult resident of Potomac, Maryland.

2. Defendant Verdad Asset Management, LLC ("Verdad") is a limited liability company organized under the laws of the State of Delaware. Defendant Daniel Rasmussen is the sole member of Verdad Asset Management, LLC.

1

3. Defendant, Daniel Rasmussen ("Mr. Rasmussen"), is an adult resident of Massachusetts.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is complete diversity between and among the parties and the amount in controversy exceeds $75,000.00, exclusive of interest and costs.

5. Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## STATEMENT OF FACTS

### A. The 2014 Creation of the Verdad Partnerships

6. This case arises from a series of agreements entered into by Stanford Graduate School of Business classmates, friends, and business partners, Nicholas M. Schmitz ("Mr. Schmitz") and Dan Rasmussen ("Mr. Rasmussen") to partner in the business activities of two related Delaware companies: VERDAD ASSET MANANGMENT, LLC, formed on January 3, 2014; and VERDAD ADVISORS, L.P., formed on March 6, 2014.

### B. Background

7. Mr. Schmitz is a 2006 graduate of the United States Naval Academy, where he graduated first in his class in military order of merit and became an officer in the United States Marine Corps upon graduation. Selected as a Rhodes Scholar, Mr. Schmitz spent his first two years of active duty at Oxford University, where he received a Master of Philosophy degree. He then attended basic officer training in Quantico, Virginia and became a Marine infantry officer. Subsequent tours of duty included service as an infantry platoon commander in Helmand Province in Afghanistan during the 200-10 surge and later as a faculty member at the Naval Academy.

8. In 2013, Mr. Schmitz left the Marine Corps and entered the MBA program at the

Stanford Graduate School of Business in Palo Alto, California. It was there that Mr. Schmitz met Defendant Rasmussen, a classmate in the MBA program. The two quickly became friends.

9. Upon their graduation from the MBA program, Mr. Schmitz, Defendant Rasmussen, and two other MBA graduates became roommates in San Francisco, California. Mr. Schmitz joined Goldman Sachs, and Defendant Rasmussen worked from their apartment trying to get his fledgling hedge fund, Verdad, off the ground. In its earliest stage, the fund was not doing well.

10. May 2016 marked the first time Defendant Rasmussen asked Mr. Schmitz for help with Verdad. Mr. Rasmussen had just started to create a weekly research email list which began as just a couple hundred people. In the second month of publication, Mr. Rasmussen wanted to run a piece introducing readers to Mr. Rasmussen's investment principles. He asked Mr. Schmitz for help writing the piece given that it referenced several philosophers he wanted to cite, and he knew Mr. Schmitz had a graduate degree in the topic. Mr. Rasmussen wanted to emphasize the importance of following and maintaining advanced commitments to rules rather than making individual case-specific judgements. Mr. Schmitz helped Mr. Rasmussen with edits to his draft and, among other suggestions, added a quote from the famous legal philosopher Joseph Raz that Mr. Schmitz thought best matched the themes Mr. Rasmussen was trying to emphasize to investors and prospects:

> *"The advantage of normally proceeding through the mediation of rules is enormous. It enables a person to consider and form an opinion on the general aspects of recurrent situations in advance of their occurrence. It enables a person to achieve results which can be attained only through an advance commitment to a whole series of actions, rather than by case-by-case examination."*

11. Defendant Rasmussen was elated with the piece, firmly believing that precisely that principle lay at the core of his and his firm's investment and management philosophies. But as the following facts demonstrate, Defendant Rasmussen's professed principles proved to be supremely

ironic given Mr. Rasmussen's abject abandonment of such principles in the course of his and Defendant Verdad's dealings with Mr. Schmitz.

### C. Mr. Schmitz Joins Verdad and Becomes Mr. Rasmussen's Business Partner

12. On October 15, 2016, during a hunting trip in Texas, Mr. Rasmussen asked Mr. Schmitz if he wanted to quit his then current job with Goldman Sachs and partner with him and Verdad in the launch and management of a Japanese hedge fund. Mr. Rasmussen asked in part because he knew Mr. Schmitz had minored in Japanese at the Naval Academy, and Mr. Rasmussen had never been to Japan himself. Mr. Schmitz said he would consider it.

13. Over the course of the next two months, Mr. Rasmussen sent Mr. Schmitz a slew of emails attempting to convince Mr. Schmitz to partner with him in launching a Japanese hedge fund. Towards the end of that period, the two discussed what the economic opportunity might look like for Mr. Schmitz. It was clear to Mr. Schmitz at the time that he was taking a nearly 100% downside risk in a startup; Mr. Rasmussen sent Mr. Schmitz a firm budget which plainly revealed that the firm was making little money net of sizeable expenses. Thus Mr. Schmitz understood that Mr. Rasmussen and Verdad could not afford to pay any employees and that any compensation arrangement would have to take the form of profit sharing.

14. Mr. Rasmussen proposed, and Mr. Schmitz agreed, on the profit sharing terms for the existing small Verdad Levered Company Fund and the planned Japan fund. This a 50%/50% split in the new Japan fund (should it be successful) and a 20%/80% split on the only other product in existence at that time, the Verdad Levered Company Fund. Those were the tangible, immediate revenue sources at the time. In addition, the two discussed growth areas. Such area included a belief that after a Japan fund, it could make sense to launch a similar European fund, and that when US markets crashed again, the firm would be launching an opportunistic side-car fund (later known as the Opportunity Fund). During these economics talks, Mr. Rasmussen repeatedly emphasized the growth potential of the firm and that the amount of profit share to which Mr. Schmitz would

be entitled from this Opportunity Fund product would be 20% (the same as that agreed to on the small existing fund).

15. In reliance on these promises, Mr. Schmitz agreed to leave his investment banking job at Goldman Sachs and start full time as Mr. Rasmussen's business partner by year end 2016. At that time, Mr. Schmitz had no initial income, having agreed to work for nothing until the firm grew through the Japan fund (intended to launch in June of 2017) and other products that he and Mr. Rasmussen had discussed. Any pay Mr. Schmitz received was 1099 income; he had no health insurance or any benefits from Verdad.

16. With only about $10 million in assets under management, no track record, no employees, and a very small reader list and sales pipeline, Verdad was very much a startup in late 2016.

17. To stretch the budget, Mr. Schmitz sold nearly everything he owned and moved into the cheapest apartment he could find an hour outside of his hometown in Maryland in the DC suburbs. Mr. Schmitz understood he was taking full risk to build a business from nearly nothing with Mr. Rasmussen, and he did not expect any of the downside security offered by traditional employment at an established firm. However, Mr. Schmitz did expect, and relied upon, the upside commitments and promises Mr. Rasmussen had made to induce Mr. Schmitz to leave an excellent position at Goldman Sachs and partner with Mr. Rasmussen and Verdad. These included the original existing fund, the planned Japan fund, the planned Opportunity Fund, and the potential Europe fund should the Japan fund go well.

18. On March 8, 2017, Mr. Schmitz and Mr. Rasmussen countersigned an employment and profit-sharing agreement "between Verdad Fund Advisers, LP . . . and Nicholas M. Schmitz" (the "Agreement") formalizing the profit-sharing understanding between the two of them.

19. Under the Agreement, Mr. Schmitz and Mr. Rasmussen agreed that Mr. Schmitz would serve, "As a Portfolio Co-Manager and Partner on the New Verdad Japan Fund," and "As

5

full compensation for all services provided the employee shall be paid at the rate of[:] Split of VLCF (Core Fund) profits: 20% to Nick Schmitz, 80% to Dan Rasmussen[;] Split of Verdad Japan Fund profits: 50% to Nick Schmitz, 50% to Dan Rasmussen[;] Split of consulting fees: based on who wins business and who does the work to be decided at the discretion of Dan Rasmussen."

### D. Launch of the First Japan Fund

20. In early 2017, as he prepared to launch the Japan fund, Mr. Schmitz discovered that any modeling or research that had previously been conducted by Mr. Rasmussen or at the direction of others was not useable in practice. Realizing that he would eventually have to take full responsibility for the product results down the line, Mr. Schmitz started over on all of the quantitative testing of the models, including a slew of back-tests on all considered factors.

21. Mr. Rasmussen had almost no involvement in the product development. At no point was he effectively a portfolio manager of the Verdad Japan fund in any meaningful sense.

22. The Japan fund launch in June 2017 was very successful and nearly tripled the size of the firm overnight with approximately $20 million Japan fund commitments by the third quarter of 2017. By the end of the year, Verdad had nearly $50 million in the Japan fund.

23. On 3 and 4 April 2018, shortly after the partnership expanded beyond two people, Mr. Schmitz and Mr. Rasmussen agreed in an e-mail exchange to Mr. Rasmussen's preferred "broader vision" for Nick being "involved in everything Verdad does" under Mr. Rasmussen's proposal "that for any non-Japan project [Nick] would earn the greater of 10% or a fair share based on [Nick's] contribution." Mr. Schmitz saw this proposal as being entirely consistent with the promises Mr. Rasmussen had made to induce him to join the firm in the first instance.

24. By June 2018, however, Mr. Schmitz's and Mr. Rasmussen's business relationship began to change over differences in investment strategy concerning the Japan Fund. Despite the fact that Mr. Schmitz ran the fund and was overwhelmingly responsible for its success, Mr. Rasmussen went behind Mr. Schmitz's back in efforts to undermine Mr. Schmitz's investment strategy. When

Mr. Schmitz found out about it, Mr. Rasmussen seemed apologetic, but subsequent events would reveal the disingenuousness of the apology.

### E. Launch of the Second Japan Fund and the Opportunity Fund

25. Seeming, in Mr. Schmitz's view, to have resolved the differences in investment strategy for the Japan fund, on September 25, 2018, Mr. Schmitz and Mr. Rasmussen countersigned an "addendum . . . to the employment and profit-sharing partnership agreement signed on 8 March 2017 between Nick Schmitz and Dan Rasmussen" (the "Addendum") establishing the basic terms of "any substantively related secondary Japan public equity product intended to be offered by Verdad, reaffirming the same profit sharing terms of the first Japan fund in the second Japan fund."

26. Under the Addendum, Mr. Schmitz and Mr. Rasmussen reaffirmed their commitment to the same profit-sharing partnership terms agreed to under the existing Japan fund launched on 06/01/2017: "50% to Dan and 50% to Nick of all management fee profits and incentive carry," and agreed: "With respect to any substantively related secondary Japan public equity product intended to be offered by Verdad which was initially conceived of and proposed by Nick in April of 2018: . . . In fulfillment of this secondary Japan product undertaking, Nick agrees to execute the same portfolio management undertaken for the existing Japan fund as well as to assist Dan in the marketing of the new product. Dan agrees to assist with the fundraising. . . . Should either party become aware of any cause of hindrance in the execution of this professional profit-sharing arrangement (personal or performance related), they will promptly notify the other party in advance giving them reasonable time and opportunity to resolve any perceived deficiencies."

27. A copy of the Agreement and a copy of the Addendum are attached as **Exhibit 1** and **Exhibit 2** respectively.

28. In October 2018, Mr. Rasmussen proposed to Mr. Schmitz and another partner that Verdad should hire Mr. Rasmussen's college fraternity brother as the head of sales of the firm to

handle all of the firm's administrative affairs.

29. Mr. Schmitz was skeptical that the firm needed the help for anything Japan-related (Verdad had already closed the first Japan fund and had more than enough demand for Japan with a waitlist), but was supportive to the extent that Mr. Rasmussen needed personal business assistance. Mr. Schmitz therefore agreed to offer the same 5% dilution the other partners were taking for the sake of the partnership. It was agreed that the three partners would each dilute 5% from the existing funds to pay for the new hire's required base salary, but that the new hire would not be entitled to the 5% dilution from Mr. Schmitz of the proposed Verdad Japan Small Value fund given that the hiring of the new hire was primarily to offset Mr. Rasmussen's workload, Mr. Schmitz had already diluted 5% of one product alongside the other partners, and that the firm already had excess demand for Japanese equities and thus had no need for administrative support.

30. Because the new hire's compensation was to be guaranteed primarily by a profit share of the Opportunity Fund significantly greater than that promised to Mr. Schmitz, a fund to be launched as soon as the next market downturn, Mr. Schmitz pushed Mr. Rasmussen to fully disclose any changes to the compensation related to that product as well, and the two exchanged emails in October 2018 once again memorializing the agreement of no less than a 10% profit share for Mr. Schmitz. Relying on that representation as a reaffirmation of the promises Mr. Rasmussen had made even before Mr. Schmitz joined the firm, Mr. Schmitz agreed to a 5% dilution of his interest in the existing Japan fund to help the firm pay for the new hire.

31. The new hire joined the firm at the end of 2019. Verdad launched the Opportunity Fund shortly thereafter and closed it in the second quarter of 2020 within approximately six months of the new hire joining the firm.

32. In the third and fourth quarters of 2020, Mr. Schmitz began to market the Verdad Japan Small Value Fund (Japan II). Demand was arguably the highest the firm had ever seen for any product launch at the firm. By November 2020, Mr. Schmitz and the firm had essentially

secured commitments for the full $80 million the fund could run.

33. Around this same time, Mr. Schmitz began receiving emails from Mr. Rasmussen stating that Mr. Rasmussen was "rethinking" the arrangements for compensating the new hire. This "rethinking" culminated in a demand from Mr. Rasmussen that Mr. Schmitz dilute his interest in Japan II so that the new hire could be paid 10% of the fund. This was contrary to Mr. Schmitz's and Mr. Rasmussen's prior agreement; nonetheless, Mr. Schmitz offered to split the cost with Mr. Rasmussen such that both their interests in Japan II would be diluted by 5%. Mr. Rasmussen subsequently became very upset with Mr. Schmitz and instructed him that Mr. Schmitz would be diluting the full 10% of his interest in Japan II. Mr. Schmitz objected.

34. Shortly after that exchange, Mr. Rasmussen began to backtrack in writing, sending Mr. Schmitz emails that he was fully willing to honor his 50% agreement on the second Japan fund; however, he would "find other ways to pay" for the new hire.

35. After that email exchange, Mr. Schmitz received a call from an associate of Mr. Rasmussen's, conveying the message from Mr. Rasmussen that he was threatening to deduct compensation from Mr. Schmitz's agreed-upon 10% share in the Opportunity Fund.

36. Japan II launched in January 2021 at full capacity.

37. Between November 2020 and May 2021, Mr. Schmitz received approximately a dozen calls from Mr. Rasmussen's associate conveying Mr. Rasmussen's threat in no uncertain terms that if Mr. Schmitz did not reduce his profit share in Japan II to pay for the new hire, Mr. Rasmussen would exercise the "nuclear option" of reducing Mr. Schmitz's agreed-upon compensation from the Opportunity Fund.

**F. Mr. Rasmussen Breaches his Partnership Agreements with Mr. Schmitz**

38. In April 2021, Mr. Rasmussen caused to be circulated to all Verdad members, including Mr. Schmitz, a new "REGULATORY COMPLIANCE MANUAL AND CODE OF ETHICS."

39. On May 5, 2021, Mr. Schmitz e-mailed Mr. Rasmussen, advising him that Mr. Schmitz had scanned through the document, that he could not discern what updates had been made given the lack of a redline and, most importantly, made clear that, in signing the compliance manual, he reserved all rights and had no intention of altering the terms or content of their prior existing partnership profit-sharing agreement or the subsequent one-page addendum dated September 25, 2018. He further made clear that it was not his intent to agree to any retroactive changes, including any surrounding the nature of Mr. Schmitz's and Mr. Rasmussen's partnership that the two had not previously discussed and agreed to privately.

40. On or around September 1, 2021, Mr. Rasmussen made good on his "nuclear option" threat and caused to be distributed to Mr. Schmitz only 2% of the proceeds from non-Japan Verdad projects, not the "greater of 10% or a fair share based on [Nick's] contribution" to which Mr. Rasmussen and Mr. Schmitz agreed in their e-mail exchange of 3-4 April 2021.

41. On June 20, 2024, Mr. Schmitz hand-delivered his resignation to Mr. Rasmussen, which Mr. Rasmussen accepted. The resignation was conditional; that is, Mr. Schmitz made clear in the letter that he would not resign if certain issues could be resolved, even going so far as to be willing to mediate the issues if that would resolve them and prevent Mr. Schmitz's resignation.

42. Mr. Rasmussen simply accepted Mr. Schmitz's resignation without further comment.

43. On July 12, 2024, Mr. Schmitz e-mailed Mr. Rasmussen a list of loose ends that need to be resolved, including Mr. Rasmussen's payment of the full 10% for non-Japan Verdad projects for which Mr. Rasmussen only paid Mr. Schmitz 2% in September 2021. The difference between the 2% paid and the full 10% owed is approximately $2,300,000.

## COUNT I
### (Injunction)

44. Plaintiff incorporates herein the preceding paragraphs as if each such averment was

set forth herein, additionally or in the alternative.

45. Defendant Mr. Rasmussen holds or controls the proceeds of the difference between the 2% paid in September 2021 and the full 10% owed, approximately $2,300,000, to which Mr. Schmitz is entitled under the Agreement, Addendum, and e-mail exchange of 3-4 April 2018.

46. Plaintiff seeks this Court's entry of an injunction compelling Mr. Rasmussen to pay over and deposit $2,300,000 into this Court's registry for ultimate disposition in these proceedings.

47. Plaintiff has no adequate remedy at law to prevent the monies from being distributed to those who are not entitled to them.

48. Plaintiff will suffer irreparable harm if Mr. Rasmussen is permitted to distribute the funds to which Mr. Schmitz is entitled to others.

WHEREFORE, Plaintiff, Mr. Schmitz, respectfully requests that judgment be entered in his favor and against Defendant Mr. Rasmussen, and that this Court enter an order:

A. Enjoining Mr. Rasmussen from distributing the $2,300,000 until directed by this Court or other court of competent jurisdiction;

B. Requiring that Mr. Rasmussen pay the $2,300,000 into this Court's registry; and

C. Grant such other and further relief as this Honorable Court deems proper.

### COUNT II
### (Fraud in the Inducement)

49. Plaintiff incorporates by reference as if set forth at length herein the allegations set forth above, additionally or in the alternative.

50. Defendant Rasmussen, on behalf of himself and his alter-ego Verdad, made material representations concerning Mr. Schmitz's profit shares in Verdad's funds to induce Mr. Schmitz to leave his investment banking position at Goldman Sachs and, at substantial financial risk, to join Verdad.

51. Plaintiff reasonably relied on those representations in deciding to leave Goldman

11

Sachs and to join Verdad and become Mr. Rasmussen's business partner.

52. Defendant Rasmussen, on behalf of himself and his alter-ego Verdad, made material representations to Mr. Schmitz in the e-mail exchanges of 3-4 April 2018, assuring Mr. Schmitz that he would be entitled to at least a 10% profit share in the Opportunity fund.

53. Plaintiff reasonably relied on those representations in agreeing to dilute his interest in the Japan II fund.

54. The representations described in Paragraphs 52 and 53 above as to Mr. Schmitz's profit share in the Opportunity Fund proved to be false.

55. Mr. Rasmussen has failed and refused and continues to fail and refuse to account for and pay to Mr. Schmitz the full 10% for non-Japan Verdad projects for which Mr. Rasmussen only paid Mr. Schmitz 2% in September 2021.

56. As a direct and proximate result of these material misrepresentations, Mr. Schmitz had been damaged in the amount of approximately $2,300,000.

WHEREFORE, Plaintiff requests that judgment be entered in his favor and against Defendant Mr. Rasmussen for his fraudulent inducements in an amount exceeding $75,000, plus interest, attorneys' fees, and such other and further relief as this Honorable Court deems proper.

### COUNT III
### (Breach of Partnership Agreement)

57. Plaintiff incorporates by reference as if set forth at length herein the allegations set forth above, additionally or in the alternative.

58. Under his partnership agreement with Mr. Rasmussen, Mr. Schmitz is due the full 10% for non-Japan Verdad projects for which Mr. Rasmussen only paid Mr. Schmitz 2% in September 2021.

59. In breach of the partnership agreement, despite there being funds to distribute, Mr.

Rasmussen failed to account for and pay to Mr. Schmitz the full 10% for non-Japan Verdad projects for which Mr. Rasmussen only paid Mr. Schmitz 2% in September 2021.

60. Despite demand, Mr. Rasmussen has failed and refused, and continues to fail and refuse, to pay to Mr. Schmitz the amounts due and owing to Mr. Schmitz under the partnership agreements between Mr. Schmitz and Mr. Rasmussen.

61. Mr. Rasmussen's wrongful refusal to account and pay, and its continued breach of his partnership agreements with Mr. Schmitz has caused and will continue to cause Mr. Schmitz monetary damages in an amount exceeding $75,000.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor and against Defendant, Mr. Rasmussen, for his breach of the partnership agreements in an amount exceeding $75,000, plus interest, attorneys' fees, and such other and further relief as this Honorable Court deems proper.

### Count IV
### (Unjust Enrichment)

62. Plaintiff incorporates by reference as if set forth at length herein the allegations set forth above, additionally or in the alternative.

63. As a result of Mr. Rasmussen's involvement in his partnership with Mr. Schmitz and control of Verdad, he was in a position to obtain income from that partnership and Verdad.

64. As a result of the above, coupled with Mr. Rasmussen's ownership and partnership interest, he was able to unlawfully retain income from his partnership with Mr. Schmitz and Verdad for himself, without properly accounting therefor and causing substantial damages to Plaintiff.

65. At all times, Mr. Rasmussen has wrongfully failed to provide to Plaintiff his share of income and other payments required to be made to Mr. Schmitz by Verdad.

66. Defendant's acceptance and/or retention of such benefits under the circumstances

makes it inequitable for him to retain such benefits without the payment of their value to Plaintiff.

WHEREFORE, Plaintiff, Mr. Schmitz, demands that judgment be entered in his favor and against Defendant, Mr. Rasmussen, for the fair and reasonable value of the monies received and retained by him in an amount exceeding $75,000 in compensatory damages, plus interest, attorneys' fees, costs, and any other relief this Honorable Court deems proper.

Dated:  August 7, 2024	Respectfully submitted,

*/s/ Jeffrey E. McFadden*
Jeffrey E. McFadden
(D. Md. Bar No. 08738)
LAW OFFICES OF JEFFREY E. MCFADDEN, LLC
312 Prospect Bay Drive East
Grasonville, MD  21638
(443) 272-4737
jmcfadden@jmcfaddenlaw.com

*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff hereby demands a jury trial in this matter.