IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

NICHOLAS SCHMITZ,                        *

    Plaintiff,                        *

    v.                                *        Civil Action No. 8: 24-2291-PX

VERDAD ASSET
MANAGEMENT, LLC *et al.*,                 *

    Defendants.                       *
                                  ***

## MEMORANDUM OPINION

Pending are Defendants Verdad Asset Management, LLC, Verdad Advisers, LP, and Daniel Rasmussen's motion to dismiss brought pursuant to Federal Rule of Civil Procedure 12(b)(6).  ECF No. 16.  The matter has been fully briefed, and no hearing is necessary.  *See* Loc. R. 105.6.  For the following reasons, the motion to dismiss is granted.

### I.    Background

In 2016, two roommates, Plaintiff Nicholas Schmitz ("Schmitz") and Defendant Daniel Rasmussen ("Rasmussen") started to mix business with pleasure.  ECF No. 11 ¶ 11.  Rasmussen had recently launched his own hedge fund, Verdad[1], but in the early days, the fund was not performing well.  Schmitz at the time was working for Goldman Sachs.  *Id.* ¶ 10.

Next, after extensive conversations between the roommates about their plans to grow certain funds at Verdad, including discussions about investment opportunities in U.S., Japanese, and European markets, Schmitz agreed to leave Goldman Sachs, sell "nearly everything he owned," move into a cheap apartment, and join Verdad.  ECF No. 11 ¶¶ 18–21.  Specifically, the

---

[1] Defendant Verdad Advisers, LP is a limited partnership organized under the laws of the State of Delaware.  ECF No. 11 ¶ 2.  Defendant Verdad Asset Management, LLC is the general partner of Verdad Advisers, LP.  *Id.* at ¶ 3.  Defendant Daniel Rasmussen is the sole member of the LLC.  *Id.*  Unless otherwise indicated, "Verdad" will describe both entities.

roommates planned to launch a fund that provided "the opportunity to invest in the US markets when high-yield spreads hit 6%." *Id.* ¶ 15. Several years later in 2020, Verdad launched this domestic fund which they called the "Opportunity Fund." *Id.*

Prior to the launch, the roommates decided to make their joint venture official. On March 8, 2017, Schmitz executed an employment agreement with Verdad (the "Agreement"). ECF Nos. 11 ¶ 22 & 11-1. Schmitz particularly agreed to become the "Portfolio Co-Manager and Partner on the New Japan Verdad Fund." ECF No. 11-1 at 2. The Agreement specifically articulated Schmitz' compensation as follows:

> (a) As full compensation for all services provided the employee shall be paid at the rate of:
>
> - Split of VLCF (Core Fund) profits: 20% to Nick Schmitz, 80% to Dan Rasmussen
> - Split of Verdad Japan Fund profits: 50% to Nick Schmitz, 50% to Dan Rasmussen
> - Split of consulting fees: based on who wins the business and who does the work to be decided at the discretion of Dan Rasmussen
>
> Such payments shall be subject to such normal statutory deductions by the Employer.
>
> Such payments will commence at the start of the trading of the Verdad Japan Fund. Prior to that date, payment will be at the sole discretion of Dan Rasmussen.

*Id. See also* ECF No. 11 ¶ 24.

The Agreement also made clear that it constituted "the entire agreement between the parties, superseding in all respects any and all prior oral or written agreements or understandings pertaining to the employment of [Schmitz]." ECF No. 11-1 at 4. Last, the Agreement specified that amendments to its terms must be made in writing and signed by all parties. *Id.*

When Schmitz first started, he realized that Rasmussen's research and modeling for the Japan Fund was "not useable in practice," so he conducted his own testing of the models. *Id.* ¶¶ 31–32. Schmitz also took on the role as portfolio manager of the Japan Fund, as Rasmussen had "almost no involvement in the product development." *Id.* ¶ 32. By the third quarter of 2017, the

Fund had $20 million in investment commitments that ballooned to $50 million by the end of the year. *Id.* ¶ 33. *See also id.* ¶ 47 (Rasmussen in a January 2018 email praising Schmitz' contributions to the Japan Fund). Schmitz, in short, enjoyed great success with the Japan Fund. ECF No. 11 ¶¶ 31–33.

Consequently, Rasmussen discussed broadening Schmitz' role at Verdad. *Id.* ¶ 34. In these discussions, memorialized in emails exchanged on April 3 and 4 of 2018, Rasmussen "propos[ed]" that Schmitz earn "the greater of 10% or a fair share based on [Nick's] contribution" for any future non-Japan fund. *Id.* This included potential profit from the newly conceived "Opportunity Fund," termed in the email the "Sidecar" fund. *Id.* ¶ 36. *See also* ECF No. 11-2.

Three weeks later, on September 25, 2018, Schmitz and Rasmussen executed an "addendum" to the Agreement (the "Addendum"). ECF Nos. 11 ¶ 37 & 11-3. Pertinent to Schmitz, the Addendum stated that "with respect to any substantively related secondary Japan public equity product intended to be offered by Verdad," and for which Schmitz had been involved in March and April of 2018, "both parties reaffirm their commitment to the same profit-sharing partnership terms agreed to under the existing Japan fund launched on 6/01/2017: 50% to Dan and 50% to Nick of all management fee profits and incentive carry." ECF No. 11-3 at 2.

Rasmussen thereafter often referred to Nick as his "partner" both internally and in communication with third parties. ECF No. 11 ¶ 51. Schmitz also considered himself a "limited partner" in the "Japan Funds he managed as well as the Europe Fund managed by another Verdad partner, Brian Chingono." *Id.* ¶ 53.

In late October 2018, the partnership agreed to hire an employee to assist Rasmussen. Schmitz, like the other partners, agreed to a "5% dilution of his interest in the existing Japan fund to help the firm pay for the new hire." ECF No. 11 ¶ 56. Because the new hire's interest was also

to come from the Opportunity Fund, Schmitz sent Rasmussen an email confirming the profit-sharing of the different funds.  *Id.*  But the new hire did not join Verdad until roughly a year later under terms not altogether clear.  *Id.* ¶ 57.

During the third and fourth quarters of 2020, Verdad began marketing the second Japan Fund (the "Japan II Fund"), which launched in January 2021.  *Id.* ¶¶ 58, 63.  Rasmussen approached Schmitz, asking that he dilute his interest in the Japan II Fund so that the "new hire" could be paid 10% of the fund.  *Id.* ¶ 59.  Schmitz agreed to give up only 5%, which angered Rasmussen.  *Id.*  Shortly thereafter, Rasmussen retracted his demand, telling Schmitz that he was fully willing to honor his 50-50 profit split with Schmitz on the Japan II Fund, and that he would find "other ways to pay" for the new hire.  *Id.* ¶ 61.  However, between November 2020 and January 2021, Schmitz heard through an unnamed "associate" of Rasmussen's that Rasmussen planned to reduce Schmitz' "agreed-upon" compensation from the Opportunity Fund to pay for the new hire.  *Id.* ¶ 64.

On September 1, 2021, Rasmussen distributed 2% of the proceeds from the "non-Japan Verdad projects" to Schmitz.  ECF No. 11 ¶ 67.  Schmitz considered this distribution to be far lower than that previously discussed.  *Id.* ¶¶ 67, 34.  Nonetheless, Schmitz stayed with Verdad, not separating from the company until June 20, 2024.  *Id.* ¶ 68.  Upon his resignation, Schmitz' demanded "payment of the full 10% for non-Japan Verdad projects [for which he had received] 2% in 2021," and which he values at $2.3 million.  *Id.* ¶¶ 68, 70.

Schmitz next filed suit against Defendants to recoup the alleged unpaid Opportunity Fund profits.  ECF No. 1.  Defendants moved to dismiss the original complaint, ECF No. 6, prompting Schmitz to amend the complaint once as a matter of right, ECF No. 11.[2]  The Amended Complaint

---

[2] Defendant's motion to dismiss the original complaint at ECF No. 6 is thus denied as moot.

brings the following common law claims against all defendants: fraud in the inducement (Count I), promissory estoppel (Count II), breach of contract (Count III), unjust enrichment (Count IV), and spoliation (Count V).  ECF No. 11.  Defendants contend that none state a legally cognizable claim.  ECF No. 16-1.  The Court considers the sufficiency of each Count separately.

## II.    Standard of Review

A motion brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the sufficiency of the complaint.  In reviewing the motion, the Court "accepts the factual allegations in the complaint as true and construes them in the light most favorable to the nonmoving party." *Rockville Cars, LLC v. City of Rockville*, 891 F.3d 141, 145 (4th Cir. 2018).  The Court may also consider documents attached to the motion to dismiss when "integral to and explicitly relied on in the complaint, and when the [opposing parties] do not challenge the document[s'] authenticity." *Zak v. Chelsea Therapeutics*, *Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015) (quoting *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999)) (internal quotation marks omitted).  To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  "A plaintiff must provide sufficient detail to show that he has a more-than-conceivable chance of success on the merits."  *Upstate Forever v. Kinder Morgan Energy Partners, L.P.*, 887 F.3d 637, 645 (4th Cir. 2018), *vacated on other grounds*, 140 S. Ct. 2736 (2020).

## III.    Analysis

### A.    Fraud in the Inducement (Count I)

The Amended Complaint avers that Defendants, through Rasmussen, made a series of false promises to lure Schmitz to Verdad and then convince him to stay.  ECF No. 11. ¶ 72.  "The tort

of fraudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 886 A.2d 924, 929 (Md. 2005) (quoting *Sec. Constr. Co. v. Maietta*, 334 A.2d 133, 136 (Md. Ct. Spec. App. 1975)).  The claim involves a defendant's promise of future performance with no present intent of performing at the time the promise was made.  *Sass v. Andrew*, 832 A.2d 247, 264 (Md. Ct. Spec. App. 2003).  To survive challenge, the complaint must make plausible that the defendant knowingly or recklessly made misrepresentation for the purpose of defrauding the plaintiff, and that the plaintiff could and did rely on the misrepresentation to his detriment, causing damage. *Dynacorp Ltd. V. Aramtel, Ltd.*, 56 A.3d 631, 660 (Md. Ct. Spec. App. 2012) (quoting *Rozen v. Greenberg*, 886 A.2d 924, 930 (Md. Ct. Spec. App. 2005)).  The claim must also be pleaded with specificity, in satisfaction of Federal Rule of Civil Procedure 9(b).  The allegations must therefore include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby."  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 783 (4th Cir. 1999) (quoting 5 WRIGHT AND MILLER'S FEDERAL PRACTICE & PROCEDURE: CIVIL § 1297, at 590 (2d ed. 1990)) (internal quotation marks omitted).

When viewing the complaint facts as true and most favorably to Schmitz, nothing makes plausible that Rasmussen knowingly or recklessly made a false misrepresentation to Schmitz for the purpose of fraudulently inducing Schmitz into the Agreement.  Further, the facts do not suggest that Schmitz relied on any specific misrepresentation to his detriment.  Beginning with Schmitz' decision to join Verdad, Schmitz complains that Rasmussen effectively oversold Rasmussen's own skills and acumen regarding the Japan Fund to bait Schmitz.  ECF No. 11 ¶ 14.  Schmitz also seems to complain that Rasmussen misled him about the "essence of [Rasmussen's] character,"

which caused Schmitz to join Verdad when he otherwise never would have.  *Id.* ¶ 26.  But even so, no facts make plausible how Schmitz relied on such puffery to his detriment.  According to the Amended Complaint, joining Verdad served Schmitz well in many respects.  Schmitz enjoyed enormous success on the Japan Fund which tripled in size in the first year and was worth $50 million.  *Id.*  ¶ 33.  Indisputably, Schmitz received 50% of profits on this fund.  *Id.* ¶ 24.  Thus, even if the Court assumes that Rasmussen induced Schmitz to join Verdad based on false representations, Schmitz had not done so to his *detriment.*

Schmitz next alleges that Rasmussen falsely promised he would pay Schmitz 10% of the Opportunity Fund proceeds to convince him to stay at Verdad. The problem for Schmitz is that no facts make plausible that Rasmussen ever promised Schmitz the claimed 10% profit from the Opportunity Fund.  The Amended Complaint avers three discrete interactions with Rasmussen as the source of the Opportunity Fund promises.  First, Schmitz points to the conversation in 2016, four years prior to the launch of the Opportunity Fund, when the roommates had generally discussed developing a fund that would capitalize on the "opportunity" for high yields on certain U.S. investments.  ECF No. 11 ¶ 15.  During these discussions, Rasmussen apparently represented that Schmitz would be entitled to 20% of the fund's profits.  *Id.*  The alleged 2016 representations, however, are no more than non-specific aspirational talk about making "piles of cash" in future endeavors.  *Id.*  These representations are simply too vague and nonspecific to be actionable in fraud.

Second, Schmitz alleges that Rasmussen promised the 10% Opportunity Fund profit share in a set of emails exchanged on April 3 and 4, 2018.  ECF No. 11 ¶¶ 34, 35, 67, 75, 92.  The Court incorporates the emails as integral to the Amended Complaint.  *See Zak v. Chelsea Therapeutics, Int'l, Ltd*., 780 F.3d 597, 606–07 (4th Cir. 2015).  When construing the exchange most favorably

to Schmitz, nothing supports that Rasmussen ever promised a 10% profit share. Rasmussen merely threw out the possibility – what he called an "initial hypothesis" – to Schmitz that if they continue with their partnership, Schmitz *may* earn in the future "the greater of 10% or a fair share based on [his] contribution" on "any non-Japan project." ECF No. 16-2 at 8. Rasmussen next asked Schmitz, "Is this also your vision?" and further expressed that if Schmitz disagreed, Rasmussen would "reset his expectations." *Id.* Schmitz, however, neither confirmed nor denied whether he shared the same vision. *Id.* Rather, he ignored Rasmussen's suggestion. *Id.* The Opportunity Fund was *never* mentioned, nor was any promised 10% profit share. *Id.* Thus, these representations could not have "misled" Schmitz into believing he was entitled to 10% of the Opportunity Fund profits if he stayed.

The third and final repository of alleged false statements, say Schmitz, arise in his email exchange with Rasmussen on October 17, 2018. ECF No. 11-2. Although Schmitz alleges that these emails reaffirm Rasmussen's promise to pay Schmitz 10% on the Opportunity Fund, the emails cannot plausibly read as Schmitz hoped. For one, the content appears to be authored solely by Schmitz. ECF No. 11-2. They are also just tables which appear to include percentage profits, but the Opportunity Fund is not mentioned by name at all. *Id.* Nor are there any other facts to make plausible that here, Rasmussen had promised Schmitz a 10% profit share of the Opportunity Fund. Because none of the supposed misstatements could have induced Schmitz to believe a promise that Rasmussen never made, the claim must fail.

### B.    Breach of Contract (Count III)

The Court next turns to the breach of contract claim. The Amended Complaint avers that Defendants broke the partnership agreement when they failed to pay him the full 10% profit for "non-Japan Verdad Projects." ECF No. 11 ¶¶ 92–97. A contract claim is straightforward. It will

survive if the complaint makes plausible with "certainty and definiteness" the "contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant." *Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 416 (Md. 2012) (quoting *Cont'l Masonry Co. v. Verdel Const. Co.*, 369 A.2d 566, 569 (Md. 1977)).[3]

Interpreting contractual provisions is "ordinarily a question of law for the court." *Wells v. Chevy Chase Bank, F.S.B.*, 768 A.2d 620, 629–30 (Md. 2001); *MCI Telecommunications Corp. v. Texas Utilities Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). Where the contract terms are clear and unambiguous, the Court must give effect to their plain meaning. *Weichert Co. of Md., Inc. v. Faust*, 19 A.3d 393, 399–400 (Md. 2011) (quoting *Nova Rsch., Inc. v. Penske Truck Leasing Co.*, 952 A.2d 275, 283 (Md. 2008)); *Aflalo v. Harris*, 583 S.W.3d 236, 241 (Tex. App. 2018). "A contract is unambiguous if it can be given a definite or certain legal meaning." *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003). The plain meaning of contractual provisions is the "customary, ordinary, and accepted meaning" of such terms. *Bainbridge St. Elmo Bethesda Apartments, LLC v. White Flint Express Realty Grp. Ltd. P'ship, LLLP*, 164 A.3d 978, 984 (Md. 2017) (quoting *Atl. Contracting & Material Co. v. Ulico Cas. Co.*, 844 A.2d 460, 469 (Md. 2004)) (internal quotation marks omitted); *TLC Hosp., LLC v. Pillar Income Asset Mgmt., Inc.*, 570 S.W.3d 749, 760 (Tex. App. 2018). The court considers the "entire language of the agreement, not merely a portion thereof." *Id.* (quoting *Jones v. Hubbard*, 740 A.2d 1004, 1016 (Md. 1999)) (internal quotation marks omitted); *J.M. Davidson, Inc.*, 128 S.W.3d at 229 (the court reads all parts of the contract together to give effect to the parties' intent).

---

[3] The Agreement specifies that the contract is subject to Texas law. ECF No. 11-1 at 4. The parties, however, rely exclusively on Maryland law. ECF Nos. 16-1, 19-1 & 20. Nonetheless, under either state's substantive law, the outcome is the same. For completeness, the Court includes authority from both states.

When viewing the allegations most favorably to Schmitz, the compensation package articulated in the Agreement and Addendum cannot be read to cover profit-sharing on the Opportunity Fund. The Agreement, executed in 2017, promised a specific profit-sharing on two existing funds neither of which was the Opportunity Fund. ECF No. 11-1. Likewise, the Addendum also did not include the Opportunity Fund, but rather "any substantively related secondary Japan public equity product intended to be offered by Verdad which was initially conceived of and proposed by Nick in April of 2018." ECF No. 11-3. As to that new "Japan product," the Addendum expressly "reaffirm[ed] their commitment to the same profit-sharing partnership terms agreed to under the existing Japan fund launched on 6/01/2017: 50% to Dan and 50% to Nick." *Id.* The Addendum was utterly silent as to any other profit splits, including the Opportunity Fund. *Id.* Accordingly, based on the plain and unambiguous terms of Schmitz' employment contract, Defendants' failure to pay Schmitz 10% of the Opportunity Funds' profits does not constitute a breach of his employment agreement.

Schmitz, in response, seems to suggest that the "promise" to pay him 10% profit from the Opportunity Fund was its own standalone agreement that amounts to an actionable oral contract between Schmitz and Rasmussen. ECF No. 11 ¶ 15 (Schmitz recounted multiple discussions with Rasmussen in 2016 regarding the Opportunity Fund). This argument is plainly foreclosed by the Agreement's terms. ECF No. 11-1. The Agreement stated unambiguously that it constitutes the "entire agreement between the parties" that can be modified "only by written instrument signed by the parties thereto." *Id.* at 4. No oral amendments allowed. Thus, even if the Court assumes that Rasmussen orally and through emails represented that he would cut Schmitz 10% on the Opportunity Fund, that promise was never reduced to a written amendment consistent with the Agreement's terms. Further, Schmitz and Rasmussen could have memorialized any stand-alone

agreement regarding the Opportunity Fund in the written Addendum that followed the April 2018 emails, but did not. For these reasons, the breach-of-contract claim fails as a matter of law, and thus, is dismissed.

### C.    Promissory Estoppel (Count II)

Alternatively, Schmitz contends that even if Defendants' promise to pay the 10% Opportunity Fund profit is not squarely actionable in contract, it is sufficient to make plausible a promissory estoppel claim. ECF No. 11 ¶ 87. Promissory estoppel provides contractual relief in the absence of a formal agreement. *Horlick v. Capital Women's Care, LLC*, 896 F. Supp. 2d 378, 396 (D. Md. 2011) (quoting *Md. Transp. Auth. Police Lodge No. 34 of Fraternal Order of Police v. Md. Transp. Auth.*, 5 A.3d 1174, 1227 (Md. Ct. Spec. App. 2010), *rev'd in part on other grounds*, 21 A.3d 1098 (Md. 2011)). To prevail, a plaintiff must make plausible (1) the existence of a clear and definite promise; (2) the promisor's reasonable expectation that the offer will induce action or forbearance on the part of the promisee; (3) inducement of actual and reasonable action or forbearance by the promise that (5) would be to the promisee's detriment unless the promise is enforced. *Sedghi v. PatchLink Corp.*, 440 F. App'x 165, 168 (4th Cir. 2011) (citing *Pavel Enters. v. A.S. Johnson Co*., 674 A.2d 521, 532 (Md. 1996)). However, where a valid and binding contract covers the same subject as that underlying the promissory estoppel claim, the estoppel claim cannot proceed. *Ver Brycke v. Ver Brycke*, 843 A.2d 758, 771 n.9 (Md. 2004). *See also, e.g., Odyssey Travel Ctr., Inc. v. RO Cruises, Inc*., 262 F. Supp. 2d 618, 626 (D. Md. 2003).

Clearly the "subject" of Schmitz' written employment agreement includes his compensation, and more particularly, his profit-sharing arrangement on specific funds. ECF No. 11-1. The Addendum to the employment agreement likewise covers the same subject—profit-

sharing on a specific fund.  ECF No. 11-3.  Accordingly, the promissory estoppel claim fails as a matter of law.

Alternatively, even if the contract somehow is rendered legally deficient, the purported promise of 10% of the Opportunity Fund profits is neither clear nor definite enough to sustain the claim.  "A clear and definite promise . . . is one that reasonably defines the contours of the action or forbearance."  *McKenzie v. Comcast Cable Commc'ns, Inc.*, 393 F. Supp. 2d 362, 373 (D. Md. 2005).  When reading the facts most favorably to Schmitz' however, no reasonable interpretation of their Opportunity Fund communications clearly and definitively promised 10% profit.  The April 2018 emails certainly did not.  ECF No. 16-2 at 8 (articulating a "vision" of future profit splits and asking Schmitz if he "shares" the vision to which Schmitz did not confirm or deny).  Nor does the October 2018 email (Schmitz sharing his written tables which does not specifically refer to the Opportunity Fund, but which refers to "Sidecar (or other)").  ECF No. 11-2.  Last, the purported 2016 discussion of future profit splits is simply too vague and indefinite to support the claim.  ECF No. 11 at ¶ 15 (parties "did discuss what this Opportunity Fund *might look like* for Plaintiff" to include a 20% profit split) (emphasis added).  For these reasons, the promissory estoppel claim must be dismissed.

### D.    Unjust Enrichment (Count IV)

Like their promissory estoppel argument, Defendants contend that the existence of a valid and binding contract renders the unjust enrichment claim unavailable.  ECF No. 20 at 10. Defendants are correct that an unjust enrichment claim cannot proceed where an express contract between the parties governs the same subject matter.  *Cnty. Comm'rs of Caroline Cnty. v. J. Roland Dashiell & Sons, Inc.*, 747 A.2d 600, 609 (Md. 2000); *Dwoskin v. Bank of Am., N.A.*, 850 F. Supp. 2d 557, 573 (D. Md. 2012).  This alone is fatal to Schmitz' claim.  The Agreement and Addendum,

as discussed, governed Schmitz' compensation scheme in its entirety.  ECF Nos. 11-1 & 11-3.  The Opportunity Fund was simply not contemplated in either.  ECF No. 11-1 at 2.  Because the agreement covers the waterfront in this regard, Schmitz cannot pursue an unjust enrichment claim.

But even if he could, no facts make plausible that Defendants were unjustly enriched.  For this claim to survive, the complaint facts must show that (1) plaintiff conferred a benefit upon defendants; (2) defendants appreciated or knew of the benefit; and (3) defendants accepted or retained the benefit under such circumstances as to make it inequitable for defendants to retain the benefit without the payment of its value.  *James B. Nutter & Co. v. Black*, 123 A.3d 535, 549 (Md. Ct. Spec. App. 2015).

Although Schmitz' hard work enriched the Defendants, no facts demonstrate why such enrichment was unjustly obtained.  Put more specifically, none of Rasmussen's alleged statements to Schmitz establish that Defendants owed Schmitz a larger portion of the Opportunity Fund profits than he ultimately was paid.  Schmitz' dissatisfaction with his cut alone does not sustain the claim absent a showing that Defendants' cut is inequitable.  Thus, the unjust enrichment claim is dismissed.

### E.    Spoliation (Count V)

Schmitz lastly complains that since he filed this lawsuit, "Verdad intentionally altered the content of its webpage resources," to omit Schmitz as the author for several corporate related publications.  ECF No. 11 ¶¶ 113–115.  Schmitz theorizes that Verdad removed his name to "destroy evidence" related to Schmitz' added value in promoting Verdad and, in turn, enriching Defendants' bottom line.  *Id.* ¶¶ 116–119.  This "spoliation," says Schmitz, entitles him to "punitive damages." *Id.* ¶ 122.

No cause of action exists for "spoliation." *Jarvis v. Staples, Inc.*, No. CIV. PJM 10-244, 2010 WL 4942010, at *45 (D. Md. Nov. 30, 2010), *aff'd*, 426 F. App'x 193 (4th Cir. 2011) ("[Plaintiff's] claim for 'obstruction of justice and spoliation of videotape evidence' fails as a matter of law, since neither the Fourth Circuit nor the State of Maryland recognizes this as an independent cause of action."); *Silvestri v. General Motors Corp.,* 271 F.3d 583, 590 (4th Cir. 2001) ("[T]he acts of spoliation do not themselves give rise in civil cases to substantive claims or defenses."); *Goin v. Shoppers Food Warehouse Corp.,* 890 A.2d 894, 898 (Md. 2006) (declining to hold that the doctrine of spoliation gives rise to an independent cause of action). Schmitz admits as much because he has since withdrawn the claim. ECF No. 19-1 at 30 n.4. Thus, the "spoliation" count is dismissed.

### IV.    Motion for Leave to File Surreply

Schmitz seeks leave to file a surreply. ECF No. 21. Surreplies are generally not permitted in this District and are granted sparingly to address new arguments raised for the first time in reply. *Boland v. Amazon.com Sales, Inc.*, 628 F. Supp. 3d 595, 599 (D. Md. 2022). "Surreplies may be permitted when the moving party would be unable to contest matters presented to the court for the first time in the opposing party's reply." *Khoury v. Meserve*, 268 F. Supp. 2d 600, 605 (D. Md. 2003), *aff'd*, 85 F. App'x 960 (4th Cir. 2004).

In support of his motion, Schmitz argues that Defendants' reply had been replete with "significant half-truths and omissions" that demand a response. ECF No. 21 at 3, 7–8. Schmitz broadly contends that Defendants selectively quoted the Amended Complaint, failed to properly refer to Schmitz as a "partner," and left out a November 23, 2016 email regarding proposed profit splits. ECF No. 21-1 at 2, 4. Schmitz also asks the Court to consider an article that refers to the Opportunity Fund as proof of the fund's existence, and an email response from Rasmussen on

October 17, 2018, that includes a spreadsheet created by Rasmussen with current, proposed, and hypothetical profit splits. *Id.* at 9, 20–21.

Although Schmitz may not like Defendants' reply, it raises no new arguments. And nothing prevented Schmitz from making the very arguments in the proposed surreply as part of his response. Thus, the Court sees no good reason to permit the surreply.

However, even if the Court granted the motion, it would not make a difference. For one, the surreply improperly attempts to amend the pleading through argument and extrinsic evidence. This, Schmitz cannot do. *See Whiting–Turner Contracting Co. v. Liberty Mut. Ins. Co.*, 912 F. Supp. 2d 321, 334 (D. Md. 2012) ("It is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal quotation marks omitted). *See also S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands*, LLC, 713 F.3d 175, 184 (4th Cir. 2013). Moreover, even viewing the proposed information as integral to the Amended Complaint and most favorably to Schmitz, nothing he offers will save the claims.

Regarding fraudulent inducement, no additional facts show that Rasmussen misled and induced Schmitz to join or stay with Verdad. Nor does the surreply help to make plausible that the parties had properly amended the Agreement, or consummated any other agreement related to the Opportunity Fund. Nor does anything plausibly establish that even if no formal contract existed, that Rasmussen had made a sufficiently clear and definite promise to Schmitz necessary to support an estoppel claim. Lastly, no additional facts reflect that Defendants' refusal to pay Schmitz 10% profit on the Opportunity Fund somehow unjustly enriched Defendants because Schmitz has yet to make plausible that Defendants ever agreed on the 10% Opportunity Fund arrangement. Generalized aspirational conversation or discussions about potential future arrangements simply do not suffice. The motion for leave to file a surreply is, thus, denied.

## V.    Dismissal With or Without Prejudice

The Court retains discretion to dismiss a claim with or without prejudice.  *Weigel v. Maryland*, 950 F. Supp. 2d 811, 825 (D. Md. 2013) (quoting *180s, Inc. v. Gordini U.S.A., Inc.*, 602 F. Supp. 2d 635, 638–39 (D. Md. 2009)).  Where "there are no set of facts that the plaintiff could present to support his claim," the claim should be dismissed with prejudice.  *Id.* at 826 (citing *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 630 (4th Cir. 2008)).  However, where a plaintiff may cure the deficiencies in the claim, the Court should dismiss the claim without prejudice.  *See Adams v. Sw. Va. Reg'l Jail Auth.*, 524 F. App'x 899, 900 (4th Cir. 2013); *Cosner v. Dodt*, 526 F. App'x 252, 253 (4th Cir. 2013).

Schmitz has already amended his complaint once as a matter of right and in response to Defendants' initial motion to dismiss.  *See* ECF Nos. 1, 6 & 11.  Both the original and amended pleading share the same facts, circumstances and core causes of action.  Defendants also had identified the same pleading deficiencies in the original complaint as they do to the amended pleading.  *Compare* ECF No. 6, *with* ECF No. 16.  The Amended Complaint, while adding some factual color to the claims, did nothing to address the legal defects fatal to the causes of action.  Nor did Schmitz' proposed surreply—his last-ditch effort to demonstrate the existence of sufficient facts to cure the pleading defects.  Given the multiple unsuccessful attempts to state a cause of action, the Court can only conclude that to allow further amendment would be futile.  For this reason, the Amended Complaint is dismissed with prejudice.

## VI.    Conclusion

For the foregoing reasons Defendants' motion to dismiss is GRANTED.  All Counts as to the Amended Complaint are DISMISSED WITH PREJUDICE.

A separate order follows.

_____8/11/2025_____          _____/s/_____
Date                                          Paula Xinis
                                              United States District Judge